UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TIMOTHY DURLEY,

                    Plaintiff,

         v.                                              Case No. 21-cv-883-pp

CHERYL JEANPIERRE, *et al.*,

                    Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (DKT. NO. 66)**

Plaintiff Timothy Durley, who is representing himself, is proceeding
under 42 U.S.C. §1983 on Eighth Amendment claims against medical officials
at Waupun Correctional Institution. The defendants have moved for summary
judgment. Dkt. No. 66. The plaintiff opposes the motion. Dkt. No. 88. The court
grants part of the motion, denies part of the motion and dismisses defendants
Cheryl Jeanpierre and Robert Weinman.

**I.     Facts**

         A.     Procedural Background

On July 28, 2021, the court received the plaintiff's complaint asserting
that medical staff—including Dr. Cheryl Jeanpierre, Health Services Unit (HSU)
Manager Robert Weinman and nurse Robert Ahlborg—were deliberately
indifferent to his asthma in May and June 2021. Dkt. No. 1. The court
screened the complaint and allowed the plaintiff to proceed on Eighth
Amendment claims against those defendants. Dkt. No. 9. The court dismissed

1

a fourth defendant (Nurse Brian Taplin) and did not allow the plaintiff to proceed on a claim against him. Id. at 6. The court also denied the plaintiff's motion for a preliminary injunction seeking unspecified relief. Id. at 7–9.

On May 3, 2022, the court issued a scheduling order setting deadlines for the parties to complete discovery and file dispositive motions. Dkt. No. 16. The court later granted the defendants' motion to extend the deadline for the parties to file dispositive motions from November 4, 2022 to December 5, 2022. Dkt. No. 38. The court again extended that deadline to December 19, 2022, dkt. no. 43, then stayed the deadline pending the court's decision on the plaintiff's motion to compel, dkt. no. 48. On June 29, 2023, the court granted the plaintiff's motion in part and denied it in part. Dkt. No. 58. The court ordered that within thirty days of the order, the defendants must respond to the plaintiff's rephrased requests for admission to all three defendants and to the plaintiff's rephrased interrogatories to defendant Ahlborg. Id. at 16, 18. The court otherwise denied the plaintiff's motion to compel. Id. at 18–20. The court set a new deadline of September 8, 2023 by which the parties must file dispositive motions. Id. at 21.

At the September 8, 2023 deadline, the defendants moved for an extension of time to file their motion for summary judgment. Dkt. No. 64. The court granted the motion and extended the parties' deadline by which to file dipositive motions to September 29, 2023. Dkt. No. 65. At that new deadline, the court received the defendants' motion for summary judgment and supporting materials. Dkt. Nos. 66–78. The court ordered the plaintiff to file his

2

response and all supporting materials by October 30, 2023. Dkt. No. 79. The court later granted the plaintiff's motion to extend his deadline to February 7, 2024. Dkt. No. 81. The court advised the plaintiff that it "w[ould] not further extend this deadline." Id.

On December 4, 2023, the court received two motions from the plaintiff, asking the court to order Waupun's library to allow the plaintiff "to e-file his documents two-sided, rather than one-sided," or to allow him "to mail his exhibits, admissions and interrogatories to the court because his documents are two-sided and the library is requiring him to file his documents one-sided." Dkt. No. 85 (citing Dkt. Nos. 83, 84). The court recounted that previously it had explained the plaintiff "must e-file his summary judgment documents and that he must follow the library's rules for e-filing." Id. (citing Case No. 21-cv-822-pp, Dkt. No. 43). The court denied the plaintiff's motions and again ordered him to e-file his summary judgment materials "according to the library's rules." Id. On January 29, 2024, the court received the plaintiff's response in opposition to the defendants' motion for summary judgment and supporting materials. Dkt. Nos. 89–93. The court separately received 207 pages of documents that the plaintiff mailed to the court despite the court's order instructing him to e-file his summary judgment materials. Dkt. No. 95.

On February 12, 2024, the court granted the defendants' motion for an extension of time to file their reply materials in support of the summary judgment motion. Dkt. No. 97. The court received those materials on February 23, 2024. Dkt. Nos. 98, 99.

B. Factual Background

1. *The Plaintiff's Complaint*

The plaintiff filed his complaint on the court's form for incarcerated persons proceeding without an attorney. Dkt. No. 1. He signed the complaint and "declare[d] under penalty of perjury that" its contents are "true and correct." Id. at 5. The court treats the verified complaint as "the equivalent of an affidavit for purposes of summary judgment, because it 'contains factual allegations that if included in an affidavit or deposition would be considered evidence, and not merely assertion.'" Beal v. Beller, 847 F.3d 897, 901 (7th Cir. 2017) (quoting Ford v. Wilson, 90 F.3d 245, 246 (7th Cir. 1996)).

The court detailed the complaint's allegations in the screening order:

> The plaintiff alleges that he is in restricted housing at Waupun. He says that on May 3, 2021, he saw Nurse Brian Taplin concerning his asthma. The plaintiff says that upon hearing him wheezing, Taplin scheduled him to see Dr. Cheryl Jeanpierre. The plaintiff says he wrote to Jeanpierre and "assi[s]tance manager" Rebert Weinman in the Health Services Unit ("HSU") about his appointment, told them he was "on the verge of a[n] asthma attack" and requested a nebulizer to treat his asthma. He alleges that Jeanpierre and Weinman both replied that the plaintiff was "on the list" to see Dr. Jeanpierre. The plaintiff alleges that while waiting for his appointment, he experienced tightness in his chest and difficulty breathing. He says that again, "their" reply was that he was on the list to be seen. He says that he wrote to Wei[n]man about his asthma and shortness of breath, but that Wei[n]man replied that he was on the list to see Dr. Jeanpierre.
>
> On June 2, 2021, the plaintiff saw Nurse Robert Ahlborg walking down the hall in the restricted housing unit. The plaintiff knocked on the door of his cell to get Ahlborg's attention and told him he felt tightness in his chest, that his asthma was acting up and that he was having trouble breathing. Ahlborg allegedly replied, "I don't believe you" and walked away. Two days later, the plaintiff suffered an asthma attack, and Nurse Taplin provided him nebulizer treatment. The plaintiff alleges that Taplin was working on the days

he sent the HSU his requests to be seen, but that Taplin did not "pull [him] out" to assess him or his asthma.

Dkt. No. 9 at 3–4 (internal citations omitted).

2. *Defendant's Proposed Facts*

The plaintiff was incarcerated at Waupun at the time of the events described in the complaint. Dkt. No. 67 at ¶1. Dr. Jeanpierre was employed as a physician at Waupun, Robert Weinman was the HSU manager and Robert Ahlborg was a Nurse Clinician 2. Id. at ¶¶2–4.

a. Medical Care at Waupun

Weinman has been a licensed, registered nurse in Wisconsin since 2017. Dkt. No. 75 at ¶3. He avers that, as HSU Manager, he manages and supervises health care services for incarcerated persons, works with primary care physicians and specialists and consults with the Bureau of Health Services. Id. at ¶4. Primary care physicians are responsible for managing incarcerated persons' medical care, while the HSU Manager provides overall administrative support and direction of the HSU. Id. at ¶5. The HSU Manager does not evaluate, diagnose, see, treat or prescribe medications for patients, nor does the manager dictate a physician's schedule. Id. at ¶6. Nursing staff and advanced care providers provide medical care with the scope and authority of their positions. Id. Dr. Jeanpierre avers that she does not set her own schedule for seeing patients. Dkt. No. 75 at ¶61. Nursing staff triage appointments for incarcerated persons based on their needs. Id.

Weinman avers that when incarcerated persons enter Waupun, they receive a handbook informing them about how to request medical or dental

5

care and advising them to immediately contact unit staff for emergencies. Dkt. No. 75 at ¶7. The handbook instructs incarcerated persons to complete HSU requests to communicate with medical staff or request an appointment. Id. at ¶8. Nursing staff triage these requests daily. Id. The response shows whether staff scheduled the patient for an appointment, referred the matter to other HSU staff or for a record review or attached educational materials. Id. at ¶10. Sometimes, staff will include written comments. Id. After staff respond to a request, they place it in the incarcerated person's personal request folder within his medical record. Id. at ¶9.

Weinman avers that nursing staff triage all HSU requests the same way, even if they are directed to the HSU manager. Id. at ¶11. This is so nursing staff can determine when a request warrants an immediate response, rather than waiting for a certain staff member to attend to the request. Id. Weinman says that nursing staff first would review any HSU request that the plaintiff directed to him. Id. A nurse would alert HSU staff if he or she believed the issue was an emergency or warranted an immediate assessment. Id. In that scenario, staff can arrange for a same-day appointment with a health care provider. Id. at ¶12. Weinman explains that as HSU manager, he did not typically see requests unless nursing staff forwarded them to him to address. Id. at ¶13. He says he did "not routinely respond to" requests—the triaging nurse would. Id.

Dr. Jeanpierre avers that incarcerated patients may request a refill of any prescribed medication by completing a Medication/Medical Supply Refill

Request form and submitting it to the HSU. Dkt. No. 73 at ¶34. It is the patient's responsibility to submit a refill request on time, which means one week before the prescription runs out. Id. HSU staff forward refill requests to the medication room, and staff there pull non-prescription medication for delivery to the patient's housing unit. Id. at ¶35. Staff must contact the central pharmacy to fill prescription medications. Id. An advanced care provider must sign off on any prescribed medication renewals. Id.

### b.    Treatment of Asthma Generally

Dr. Jeanpierre explains that asthma is a chronic condition that affects the airways in the lungs, which carry air in and out of the lungs. Dkt. No. 73 at ¶8. She avers that the airways can become inflamed and narrowed in asthmatic persons. Id. Jeanpierre avers that asthma symptoms vary by type and severity and may include "wheezing, musical or whistling sounds in the airway, coughing or feeling tightness in the chest." Id. at ¶9. Cold air, pollen, respiratory illness or exercise can magnify symptoms; these are called "asthma triggers." Id. An asthma attack occurs when an asthmatic person's symptoms worsen, their "pulse oximetry drops below 70–80," their respiratory rate goes up and there is a wheezing sound in their lungs. Id.

Jeanpierre avers that asthma is managed and treated in a variety of ways, which may include monitoring, avoiding triggers and medication. Id. at ¶10. She says that most patients use a bronchodilator, which opens airways to allow the patient to breathe easier. Id. at ¶11. Patients can use short-acting bronchodilators, or rescue inhalers, to relieve sudden or acute symptoms after

7

they have begun. Id. Albuterol is a common short-acting bronchodilator. Id. Jeanpierre avers that overuse of a rescue inhaler may suggest that the patient's asthma is poorly controlled and needs better treatment. Id. Long-acting bronchodilators, also called maintenance inhalers, are for long-term use to control and help prevent asthma symptoms. Id. at ¶12. Maintenance inhalers often are taken twice per day, even if the patient is not experiencing symptoms. Id. Dulera is a common long-acting bronchodilator and contains a combination of a steroid and a long-acting beta agonist. Id.

Jeanpierre avers that bronchodilators are commonly delivered to the lungs by a handheld, metered-dose inhaler. Id. at ¶13. Patients shake the inhaler, hold it between their lips, breathe in deeply "as they puff the medicine into their mouth" and hold their breath for at least five seconds. Id. Patients also may use a spacer or chamber, which connects to the mouthpiece of an inhaler and allows the medicine to disperse into the tube. Id. at ¶14. A spacer can assist patients who have difficulty with the proper timing for inhaler use. Id.

Jeanpierre explains that an alternative to an inhaler is a nebulizer, which is a small machine that turns liquid medicine into a breathable mist. Id. at ¶15. The patient breathes in the medicine through a connected mouthpiece or facemask, which allows the medicine to enter the lungs. Id. A nebulizer runs on electricity through a wall outlet or a battery. Id. Jeanpierre avers that inhalers are preferable for some patients because they are small and portable, do not require a power outlet or battery and deliver medicine more quickly to the lungs. Id. at ¶16. She also avers that nebulizers "have been widely

understood to increase the risk of Covid-19 transmission due to increased aerosol-generating procedure." Id. She explains that not all patients will satisfactorily control their asthma despite the treatment available and may suffer occasional asthma attacks. Id. at ¶17.

c. Treatment of the Plaintiff's Asthma

On November 8, 2019, the plaintiff was transferred from Columbia Correctional Institution to Waupun with a diagnosis of asthma. Dkt. No. 67 at ¶27. On November 21, 2019, Dr. Manlove (not a defendant) entered an order allowing the plaintiff to have an Albuterol inhaler while he was housed in the Restricted Housing Unit (RHU). Id. at ¶28; Dkt. No. 68 at 78.

On February 13, 2020, Nurse Ahlborg saw the plaintiff for complaints for throat discomfort. Dkt. No. 68 at 58–61. The plaintiff asked for a nebulizer in his cell once he was moved out of the RHU. Id. at 61. Ahlborg noted that the plaintiff had an existing order for a nebulizer. Id. On April 13, 2020, Manlove determined that instead of a nebulizer, the plaintiff should use an Albuterol inhaler with a spacer because of COVID-19 concerns. Id. at 74. He ordered the nebulizer removed from the plaintiff's cell and told the plaintiff to notify staff if he needed to use it, and they would contact the HSU. Id. The next day, a non-defendant nurse gave the plaintiff a chamber to use with his inhaler. Id. Manlove met with the plaintiff on April 23, 2020 to discuss the suspension of the nebulizer, which he explained "was temporarily yet [*sic*] taken away to reduce the risk of the infectious aerosols." Id. at 53. Manlove noted that the reasons for this decision "apparently were not well explained to the patient," so

9

he "had a long talk with him about the reasons to avoid using nebulizers for now." Id. He advised the plaintiff that "using a spacer should give a similar effect to a nebulizer treatment," and he noted that the plaintiff "apparently understands the reasons for this and is agreeable." Id. He advised the plaintiff to contact the HSU "if he starts having problems and using his inhaler with a spacer is not effective," and staff "would consider returning his nebulizer." Id.

On June 17, 2020, the plaintiff reported to Advanced Practice Nurse Prescriber (APNP) Mary Moore (not a defendant) that his inhaler was not effective and asked to have the nebulizer restarted. Id. at 77. The next day, Moore ordered a new medication for the plaintiff's maintenance inhaler. Id. at 84. A few weeks later, on July 3, 2020, Moore saw the plaintiff for his complaints of shortness of breath, which he said were caused by the hot, humid weather. Id. at 6. The plaintiff reported that the inhaler was not working with the medication, which he previously had used in September 2019. Id. Moore determined that the plaintiff's asthma was "not optimally controlled" and prescribed Wixela to be used with his inhaler up to four times per day. Id. She found "no medical need to keep nebulizer in cell," noting that the plaintiff was "not happy about this" and that he felt "like 'an experiment' in regards to changing/adding medications." Id. Moore again denied the plaintiff's request to keep a nebulizer in his cell. Id. The plaintiff requested nebulizer treatment from HSU staff eight times from July 10 to 24, 2020. Id. at 58, 72–73, 86.

On July 25, 2020, the plaintiff received a conduct report for lying to and threatening a correctional officer who had escorted the plaintiff to receive

nebulizer treatment. Dkt. No. 71 at 2. The conduct report shows that the plaintiff falsely told the officer that he was restrained when the officer was preparing to return the plaintiff to his cell. Id. The plaintiff then told the officer "that if [the officer] would've opened the door it would have been a bad day for [him]." Id. The plaintiff did not contest the conduct report and accepted a major disposition. Id. at 1.

Sometime in July or August 2020, Dr. Jeanpierre learned about the plaintiff's conduct reports for threatening staff when he was receiving nebulizer treatment. Dkt. No. 73 at ¶29. Because of this conduct, the plaintiff was placed on a "back of cell" restriction, which is a security protocol to protect nursing staff. Id. at ¶30. The plaintiff would have to remain in the back of his cell while staff brought the nebulizer to his cell, placed it in his cell's trap and passed the device in while keeping a distance. Id.; Dkt. No. 68 at 71. Jeanpierre explains that this restriction meant nursing staff were no longer able to physically assess the plaintiff before administering the nebulizer. Dkt. No. 73 at ¶30.

Between July 25 and August 10, 2020, nursing staff provided the plaintiff nebulizer treatment seven times. Dkt. No. 68 at 71–72, 79–82. Jeanpierre avers that this suggested that the plaintiff's Albuterol inhaler was not providing him relief. Dkt. No. 73 at ¶31. On August 10, 2020, correctional staff informed the HSU that the plaintiff would receive nebulizer treatments through his trap box as Jeanpierre explained above. Dkt. No. 68 at 71. The next day—August 11, 2020—the plaintiff asked Nurse Taplin for nebulizer treatment, but minutes later began "yelling and threatening to harm staff." Id.

at 71. The nurse noticed no signs of distress, so he deemed the situation "to[o] dangerous for [the plaintiff] to get his neb treatment." Id. Taplin discussed this with the plaintiff's provider, who is not named but who agreed to that course of action. Id. Later the same day, Ahlborg administered a nebulizer treatment but was unable to perform an assessment "[d]ue to some security concerns." Id. at 70. The plaintiff received a conduct report for the threats he made on August 11, 2020, which he did not contest. Dkt. No. 72.

Between September 2020 and May 2021, the plaintiff submitted only three refill requests for Albuterol. Dkt. No. 68 at 48–50. This led Jeanpierre to believe that he was not taking the medication as prescribed because he would have needed more frequent refills if he was complying with the prescription. Dkt. No. 73 at ¶33. But between August 12 and September 17, 2020, he received nebulizer treatment seventeen times. Dkt. No. 68 at 64–70. Each time, the nebulizer was provided to him at his cell per his back-of-cell restriction. Id. The nurse who administered the nebulizer often commented that the plaintiff was not in respiratory distress at the time, was able to yell or shout just before administration and/or appeared the same before and after treatment. Id.

On September 18, 2020, the plaintiff received a conduct report after "he attempted to remove the back of cell trap box by using his hands to maneuver the security deadbolt." Dkt. No. 70 at 1. Correctional staff directed the plaintiff to keep his hands inside his cell, and the plaintiff responded by "flip[ing] . . . off" the officers. Id. He then "continued to try and knock the back of cell trap off while also pulling on the nebulizer, going further into his cell away from the

door." Id. The plaintiff recounts that he was found guilty only of disrespect based on this conduct report and was found not guilty of misusing his medication, disruptive conduct and disobeying orders. Dkt. No. 90 at ¶52; Dkt. No. 70 at 1.

On October 8, 2020, staff administered nebulizer treatment to the plaintiff. Dkt. No. 69 at 1. When they attempted to retrieve the nebulizer from the plaintiff, he refused their directions to hand it back to them. Id. Correctional staff talked with the plaintiff for twenty minutes to get the nebulizer back. Id. The plaintiff gave staff "ultimatums to give him his paper work back or he would not get [*sic*] the nebulizer back." Id. Staff recount that the plaintiff was on a paper restriction for a previous conduct report. Id. The plaintiff "then stated that the only way [they were] getting the nebulizer back is if [they] run in on him." Id. Staff ordered the plaintiff to hand out the nebulizer, and he "again stated that [they were] going to have to come in and get it." Correctional staff left the plaintiff's housing range. Id. The plaintiff received a conduct report for disobeying orders. Id.

Jeanpierre eventually learned about the September and October 2020 conduct reports. Dkt. No. 73 at ¶40. On October 9, 2020, Moore discontinued the plaintiff's nebulizer order because of "Misuse/Diversion." Dkt. No. 68 at 79.

On November 20, 2020, Nurse Donna Larson (not a defendant) heard the plaintiff yelling to other incarcerated persons as she was passing out medication. Id. at 4. As she got closer, he began to yell at her in complete sentences, saying he needed nebulizer treatment. Id. The nurse explained that

his nebulizer treatment had been discontinued, and he yelled back at her in complete sentences, "They can't do that" and "They will not give me my nebulizer." Id. The nurse informed the plaintiff that because he was able to yell at her and other incarcerated persons, he "was not in respiratory distress." Id. Larson reassured the plaintiff that if he was short of breath or in distress, the HSU would see him. Id. She told him to use his Albuterol inhaler in the meantime, and the plaintiff nodded at her and said "ok." Id.

On December 18, 2020, Ahlborg walked past the plaintiff's cell while tending to an emergency, which prompted the plaintiff to request nebulizer treatment. Id. at 63. Ahlborg reported the plaintiff as saying, "nurse bob they used gas up here and [the plaintiff] need[s] a nebulizer treatment." Id. Ahlborg tended to the emergency and returned to the plaintiff after, telling the plaintiff that he had a rescue inhaler and steroid inhaler but no order for a nebulizer. Id. Ahlborg noted that the plaintiff "continued to speak in full sentences the entire conversation." Id.

On February 26, 2021, Nurse Dixie Berres (not a defendant) saw the plaintiff in the RHU treatment room for a nursing sick call. Id. at 57. He complained about headaches and breathing issues, and he asked for additional medication for his headaches and the return of a nebulizer. Id. He told Berres that his Albuterol inhaler and Wixela did not help and claimed that he was "wheezing daily." Id. Berres reviewed the plaintiff's medical administration record, which showed that he had not been taking Wixela as directed. Id. She encouraged the plaintiff to use his Wixela inhaler. Id.

On March 18, 2021, Nurse Ashley Haseleu (not a defendant) saw the plaintiff for complaints of respiratory problems. Id. at 62. She noted that he "did not appear to be in any distress standing by cell door speaking." Id. He told her that his inhalers were not working and claimed that he was using them up to six times per day. Id. Haseleu reviewed his medication records, which showed that he had requested refills only twice and confirmed that "he is not used [*sic*] as directed." She instructed the plaintiff to use his inhalers as directed, but he told her that they did not work for him "on the street." Id. He also asked to see his provider. Id.

On March 24, 2021, Jeanpierre saw the plaintiff for a primary care visit. Id. at 53. She noted that the plaintiff was not wheezing and was speaking in full sentences. Id. She determined that his asthma was stable and directed him to "continue with the inhalers and follow-up as needed." Id.

### d. May 2021

On May 3, 2021, Nurse Taplin saw the plaintiff for his request for a nebulizer. Dkt. No. 68 at 56; Dkt. No. 95 at 61. Dr. Jeanpierre avers that Taplin "noted 'occasional expiratory wheezes' although [the plaintiff] was 'not in any distress[.]'" Dkt. No. 73 at ¶48. But those notes from Taplin are not in the defendants' exhibits. The plaintiff attached what appears to be the second page from this sick call visit. Dkt. No. 95 at 56. This page includes Taplin's comments: "Pt stated that he thinks he is using his albuterol inhaler too much and that his Wixela doesn't seem to be effective. Pt did have ocassional [*sic*] expiratory wheezes were noted. Will refer pt to his provider and message sent.

15

Pt not in any distress at this time." Id. Later the same day, Taplin messaged Jeanpierre, "Pt states that he doesn't think his Wixela is working." Dkt. No. 68 at 76. The plaintiff's records do not show a response from Jeanpierre, and she says nothing else about May 3, 2021 in her declaration.

On May 20, 2021, the plaintiff submitted an HSU request complaining that he was having trouble breathing, was wheezing, needed to be assessed and wanted nebulizer treatment. Id. at 47. He also wrote, "its [*sic*] hot—stuffy [i]n these rooms." Id. Jeanpierre responded the next day, "you have albuterol–not using" and "you misused nebulizer." Id. She avers that she "would have been able to view this information in the nurses' documentation in the portion of [the plaintiff]'s medical chart." Dkt. No. 73 at ¶51.

The next day, May 21, 2021, Nurse Jennifer Kacyon (not a defendant) saw the plaintiff at his cell but could not conduct a physical assessment because the plaintiff was on quarantine for COVID after a court visit. Dkt. No. 68 at 3. The plaintiff told Kacyon that he needed nebulizer treatment "because it is hot in his cell." Id. Kacyon found "[n]o urgent need for nebulizer treatment at this time" and advised the plaintiff that if he needed urgent nebulizer treatment or had urgent respiratory concerns, "he would be treated per protocol." Id. at 3–4. The plaintiff told Kacyon "that he will write to his ACP [advanced care provider]." Id.

On May 23, 2021, the plaintiff submitted a request for information directed to Jeanpierre, complaining that he had not seen her about his asthma for two weeks even though she was "made aware by 2–3 nurse's, concerning

[his] weezing [*sic*]." Id. at 43–44. He said that he was "havin[g] trouble breathing" and was wheezing, but that she was "not doin nut n [*sic*] about it." Id. at 44. He wrote, "what R u waitin for an asthma Attack [*sic*]." Id. The same day, the plaintiff submitted two HSU requests complaining that medical staff had not seen him about his asthma, even though he "made [them] [a]ware 2 wk's ago." Id. at 45–46. He reiterated that he was wheezing and "need[ed] [his] nebulizer." Id. at 45. His second HSU request asked why he was not "pulled out last wk" after he wrote the May 20, 2021, request "concernin[g] [his] weezing–asthma." Id. at 46. He reiterated that he was "havin[g] trouble breathing" and that his room is "hot–stuffy–dusty." Id. The next day—May 24, 2021—a nurse responded to both of the plaintiff's May 23, 2021 requests, noted that he was seen May 21, 2021 and scheduled him for an appointment with his medical provider. Id. at 45–46.

On May 24, 2021, the plaintiff filed another HSU request complaining that he was not "pulled out" of his cell that day after writing his May 23, 2021 requests about his wheezing. Id. at 42. He wrote that the HSU was "not takin[g] [his] asthma serious." Id. The same day, a nurse responded by noting that the plaintiff was seen on May 21, 2021 and that he was scheduled to be seen by his provider. Id.

On May 25, 2021, the plaintiff submitted four requests for information and an HSU request. Id. at 33–41. The HSU request accused nursing staff of lying about him being seen, pulled out of his cell and assessed on May 21, 2021. Id. at 41. He said the nurse only "stop[ped] at the door" and talked with

him. Id. HSU manager Weinman responded to this request the next day, clarified that the plaintiff's records did not say "that [he] w[as] assessed" and asked "Who said you were?" Id. The plaintiff's first request for information was addressed to Weinman and asked for the names of nurses working certain shifts. Id. at 39–40. This request was forwarded to Weinman, who responded the next day and advised the plaintiff that he could request a file review for that information. Id. at 40. The plaintiff's second information request also was addressed to Weinman and accused "Nurse Jen" of lying about assessing him on May 21, 2021. Id. at 37–38. This request also was forwarded to Weinman, who responded the next day and explained that the nurse "did not say she assessed [him]." Id. at 38. Weinman explains that he meant "there was no indication that Nurse Jen specifically was supposed to have assessed" the plaintiff. Dkt. No. 75 at ¶24.

The plaintiff's third request for information was directed to Jeanpierre, again accused nursing staff of lying about his May 21, 2021 assessment and said that he had asked the records office to preserve "the hallway footage" from that day so he could "fil[e] a lawsuite [*sic*] on this." Dkt. No 68 at 35–36. This request was forwarded to Weinman, who responded the next day and noted that he had previously addressed the complaint. Id. at 36. The plaintiff's fourth information request was directed to Weinman, and it again complained about the nurse who allegedly lied about assessing the plaintiff. Id. at 33–34. This last request was forwarded to Weinman, who responded the next day and again noted that he previously had addressed the complaint. Id. at 34.

e.     June 2021

On June 1, 2021, the plaintiff submitted another HSU request
complaining that Dr. Jeanpierre had not seen him or assessed him for over two
weeks. Id. at 30. Nurse Ann York (not a defendant) scheduled the plaintiff for a
visit with his provider and referred his complaint to HSU Manager Weinman.
Id. Weinman responded on June 4, 2021, noting that the plaintiff had been
seen that day. Id. (The court will discuss the June 4, 2021, events below. See
infra.)

The plaintiff also submitted three requests for information on June 1,
2021. Id. at 21–24, 28–29. The first request is difficult to read, but it appears to
again complain about the treatment of the plaintiff's asthma and threaten
litigation that was "gone set yaw straight [sic]." Id. at 29. York forwarded this
request to Weinman the next day. Id. Weinman responded on June 4, 2021,
noting that "HSU is seeing [the plaintiff] based on slips and nursing judgement
[sic]." Id. The second and third requests were directed to Weinman, and they also
are difficult to read. Id. at 21–24. The second appears to complain that HSU was
not seeing, assessing or evaluating the plaintiff and his asthma. Id. at 24. The
third request accused HSU staff of disregarding his asthma and wheezing in
retaliation for filing complaints and lawsuits, and it again threatened litigation
against medical staff. Id. at 22. Weinman responded to both requests on June
11, 2021, explaining that nursing staff had "seen or attempted to see" the
plaintiff eight times "since June 1st." Id. at 22, 24. He noted that when the
plaintiff "alert[s] staff of issues, it appears [they] see you." Id.

On June 2, 2021, Nurse Ahlborg passed the plaintiff's cell while distributing medication. Id. at 7. The plaintiff stopped Ahlborg and asked "when he was going to see the Doctor regarding his breathing complaints." Id. Ahlborg responded that he did not know. Id. Shortly after, a range officer told Ahlborg that the plaintiff "said he can't breath [*sic*] and he is wheezing." Id. Ahlborg returned to the plaintiff's cell where he "observed for a full minute at the cell door as [the plaintiff] was watching TV with his back to the window." Id. Ahlborg called the plaintiff's name, and the plaintiff "came to the window smiling." Id. He told Ahlborg that he "need[ed] to be pulled out and evaluated for [his] breathing." Id. Ahlborg asked if the plaintiff was taking his long-acting inhaler, and the plaintiff "gave [him] a 2 plus minute response without pausing" and claimed it did not work and he needed a nebulizer. Id. Ahlborg told the plaintiff he would not pull the plaintiff from his cell for an evaluation "because [the plaintiff] did not present as someone in respiratory distress as evidenced by his ability to speak clearly at volume for extended periods and how he was sitting with no evidence of respiratory distress and a respiratory rate of 14 prior to acknowledging [Ahlborg's] presence." Id. Ahlborg noted that when the plaintiff "realized [Ahlborg] was not going to have him brought out he loudly called [Ahlborg] a bitch and told [him] to get [his] faggot ass away from the door." Id.

Ahlborg avers that typically, there is no need to pull a patient from his cell to evaluate him for asthma-related concerns because "a cell-site assessment allows sufficient access to assess the patient's condition." Dkt. No.

74 at ¶15. He explains that a patient who can speak in long sentences without pausing is not "experiencing shortness of breath or respiratory distress." Id. at ¶17. Ahlborg explains that a respiratory rate of 14 is at the lower end of the normal range for an adult. Id. at ¶19. He avers that patients in respiratory distress generally have respiratory rates greater than 20 breaths per minute. Id. Ahlborg says that he "determined that further assessment was not necessary because [the plaintiff] exhibited no signs of air hunger, shortness of breath, or respiratory distress." Id. at ¶20.

Later on June 2, 2021, the plaintiff submitted two HSU requests. Id. at 26–27. The first was directed to Weinman and Jeanpierre, and it complained that Ahlborg "refused 2 pull [him] out" and assess him earlier that day despite his "trouble breathin[g]–weezin[g] [and] tightness in [his] chest." Id. at 27. He asked, "what yaw gone do about this [*sic*]." Id. The second request asked that staff complete an incident report about the plaintiff's "continued refusal N Wixela inhaler [*sic*]." Id. at 26. He says he "went months without it" and has "complain[ed] n the pass [*sic*] since last year of it not working." Id. York forwarded both requests to Weinman on June 3, 2021, and he responded the next day. Id. at 26–27. Weinman recounted that medical staff saw the plaintiff, and his provider had "ordered new medication for [him] to try. Id. at 27. He advised the plaintiff to "[p]lease take as ordered for it too [*sic*] work." Id. Weinman's response to the plaintiff's second request about Wixela instructed him to see Weinman's response to the first request because it "raised the same issue." Id. at 26; Dkt. No. 75 at ¶52.

21

Also on June 3, 2021, Jeanpierre recounted that she had a scheduled appointment with the plaintiff, but that it had to be rescheduled because of a security issue in the RHU involving "multiple officers." Dkt. No. 68 at 6; Dkt. No. 73 at ¶60. This meant there were no officers to escort the plaintiff to the examination room. Dkt. No. 73 at ¶60.

In the morning on June 4, 2021, Nurse Taplin saw the plaintiff in the RHU after security reported that he was "breathing heavy in his cell." Dkt. No. 68 at 54–56. Taplin recounted that the plaintiff showed "[i]nspiratory wheezes," and he gave the plaintiff nebulizer treatment. Id. at 56. He stated that the plaintiff "was not using accessory muscles to breath but was breathing fast and heavy through his abdomen." Id. After he received the nebulizer treatment, the plaintiff said "he felt better." Id. Taplin recounted that his "breathing ha[d] slowed back to normal," and his O2 level "went from 93% pre to 96% post" treatment. Id. Correctional staff returned the plaintiff to his cell for observation. Id.

At around noon on June 4, 2021, Weinman and Jeanpierre spoke with the plaintiff about his asthma and requests for a nebulizer. Id. at 14–15. Weinman referenced the plaintiff's history of abusing or misusing his nebulizer, which was why the HSU had discontinued his prescription to have one in his cell. Id. at 15. Weinman reviewed the plaintiff's Medical Administration Record, which showed that the plaintiff "has never consistently taken medication therefore full effects and benefits would not have been realized." Id. He noted that HSU staff had educated the plaintiff about that "multiple times in writing

and in person." Id. Because the plaintiff continued to complain that Wixela and his inhalers were not working, Weinman explained that the plaintiff's provider would "submit a non-formulary request" so the plaintiff could "try a different medication." Id. Weinman explained that when the plaintiff received the new medication, HSU staff would educate the plaintiff "about the importance of following [provider] orders to achieve therapeutic relief." Id. Weinman reminded the plaintiff that he could contact the HSU if he had an emergency, including a need for nebulizer treatment. Id.

Jeanpierre also spoke with the plaintiff at his cell door in the RHU and informed him that she was changing his prescription from Wixela to Dulera through the non-formulary request. Id. at 5. She noted that the plaintiff agreed with that course of action. Id. She also noted that during their conversation, the plaintiff showed "no nasal flaring or shortness of breath," and that his breathing was "nonlabored." Id. at 5–6. Jeanpierre reiterated that the plaintiff was not allowed to have a nebulizer in his cell "because of multiple conduct reports for noncompliance and refusing to return the machine" and because of his history of assaulting staff. Id. at 6. Jeanpierre notes that before speaking with the plaintiff, she talked with the institution pharmacist, who said that the plaintiff previously had had success managing his asthma with Dulera. Dkt. No. 73 at ¶66. He told her that trying Dulera again instead of Wixela "was worth trying." Id. The pharmacist approved Jeanpierre's non-formulary request to switch the plaintiff to Dulera, which was prescribed on June 8, 2021. Dkt. No. 68 at 8–9.

Later in the afternoon on June 4, 2021, after Weinman and Jeanpierre's conversation, Ahlborg saw the plaintiff for complaints of chest pain and his request for nebulizer treatment. Id. at 2–3. Ahlborg noted that the plaintiff displayed "anterior respiratory wheezing," which means he was wheezing in the front of his chest. Id. at 3; Dkt. No. 74 at ¶22. The plaintiff told Ahlborg that he had used his rescue inhaler recently, but Ahlborg noted that the plaintiff "has been refusing his wixela inhaler." Dkt. No. 68 at 3. Correctional staff moved the plaintiff to a strip cell for Ahlborg's safety, and Ahlborg administered an Albuterol nebulizer. Id.; Dkt. No. 74 at ¶¶24–25.

On June 5, 2021, Weinman saw the plaintiff for complaints of shortness of breath and wheezing. Dkt. No. 68 at 51–52. He observed that the plaintiff was "breathing normally" and was not wheezing or making "other noises." Id. at 52. The plaintiff told Weinman that "he had used his inhlaer [*sic*] a short time ago and this appears to have helped." Weinman told the plaintiff to alert security if anything changed. Id.

On June 7, 2021 the plaintiff submitted an HSU request asking if he was still on the list to see Jeanpierre about what he claimed was an asthma attack that he had on June 4, 2021. Id. at 25. Weinman notes that HSU staff did not respond to this request or forward it to Weinman, so he did not see it or respond to it. Dkt. No. 75 at ¶54. He says that he does not know why no one responded to the request "or forwarded [it] to the appropriate person for a response." Id. He avers that if he had received the request, he would have responded or forwarded it to the appropriate staff person. Id. at ¶55.

On June 13, 2021, the plaintiff filed an HSU request asserting that he was not assessed from May 3 through June 4, 2021. Dkt. No. 68 at 20. A nurse forwarded this complaint to Weinman, who responded the next day, "Noted." Id. Weinman also asked if the plaintiff's "new inhaler [was] working better." Id. On June 22, 2021, the plaintiff submitted an HSU request directed to Weinman that says, "Wow Dulera inhaler works." Id. at 19. He reported that it had not "been really hot" in his cell and that his allergies "aren[']t act N up [sic]." Id. York forwarded this request to Weinman, who responded on June 25, 2021 and thanked the plaintiff "for the information." Id. He advised the plaintiff to "let HSU know if something changes." Id.

Jeanpierre noted missed appointments with the plaintiff on June 23 and July 1, 2023, because the plaintiff was in court and then on quarantine. Dkt. No. 68 at 5. She saw him again July 16, 2021 for an assessment of his hunger strike. Id. The plaintiff said he was on a hunger strike because of issues with security and his provided diet and because he wanted to have a nebulizer in his cell. Id. Jeanpierre "told him that this was not an option as he abused it in the past and that if he really needed it he could notify security or the nurse and he would be provided to treatment." Id. The plaintiff "was not happy" and said he would remain on hunger strike. Id. Jeanpierre noted that he was alert, oriented and had clear speech and a steady gait. Id.

Jeanpierre avers that during the time the plaintiff was in her care, he had access to short-acting/rescue inhalers and long-acting/maintenance inhalers. Dkt. No. 73 at ¶72. She opines that those inhalers "were medically sufficient to

manage his asthma." Id. Jeanpierre avers that the plaintiff reported not using his inhalers because he wanted nebulizer treatment, which he believed was more effective for his asthma. Id. at ¶36. But she says that because the plaintiff did not consistently use his long-acting inhaler, "the full effects and benefits or lack of benefits were not known." Id. Jeanpierre considered several factors in prescribing the plaintiff an Albuterol inhaler, including that he had no physical or cognitive issues that made it difficult for him to use an inhaler, the increased risk of contracting COVID-19 from using a nebulizer and the plaintiff's history of misconduct and misuse of his nebulizer. Id. at ¶37. Given these considerations, Jeanpierre would not "prescribe another asthma medication for [the plaintiff] just because he did not agree with" her. Id. at ¶38.

Weinman notes that between May 3, 2021 and March 3, 2022, he replied to nineteen requests that the plaintiff submitted about his asthma. Dkt. No. 75 at ¶15. He avers that he did not find a request from the plaintiff that he personally received or reviewed where the plaintiff told him that "he was 'on the verge of a[n] asthma attack' and requested a nebulizer to treat his asthma." Id. at ¶71. He says he never responded to a similar request by telling the plaintiff "that he was 'on the list' to see Dr. Jeanpierre." Id.

### 3. *The Plaintiff's Materials*

#### a. The Plaintiff's Exhibits

The plaintiff attached 88 pages of exhibits to his response to the defendants' motion for summary judgment. Dkt. No. 88-1. He separately mailed to the court a packet containing an additional 207 pages of exhibits.

Dkt. No. 95.[1] These exhibits are not in any discernible order, and they are not consistently labeled. Some exhibits are labeled with numbers, others are labeled with letters. Some exhibits are not labeled or are not relevant. The exhibits that the plaintiff often cites in support of his proposed facts or the statements in his declaration are difficult to locate in his variously labeled documents, difficult to read or do not appear to exist. The court will not wade through the plaintiff's exhibits to determine which pages, if any, are relevant to his proposed facts or his declaration. See Federal Rule of Civil Procedure 56(c)(3); Jordan v. Block, Case No. 21-CV-1473, 2023 WL 6318742, at *3 (E.D. Wis. Sept. 28, 2023) (citing Gross v. Town of Cicero, Ill., 619 F.3d 697, 702 (7th Cir. 2010)). The court has reviewed only the exhibits that the plaintiff cited and that the court could readily locate, read and review.

          b.       The Plaintiff's Declaration

      The plaintiff details his version of the events underlying his claims. Dkt. No. 92. He avers, as he alleged in his complaint, that Nurse Taplin saw him on May 3, 2021, for wheezing. Id. at ¶206. He says that Taplin noted that the plaintiff had "occasional expiratory wheezes." Id. The plaintiff says he "also wrote to 'Jeanpierre'" on May 3, 2021, about an appointment for his wheezing. Id. (citing Dkt. No. 95 at 61). The plaintiff says his asthma worsened, and on May 20, 2021, he again wrote to Dr. Jeanpierre about having trouble breathing

---

[1] The defendants' response to the plaintiff's proposed facts suggests that the plaintiff did not send a copy of these mailed exhibits to the defendants or defense counsel. See Dkt. No. 99 (citing only Dkt. No. 88-1 and noting that counsel was unable to locate many of the plaintiff's cited exhibits).

and wheezing. Id. at ¶207. As Jeanpierre averred, she responded with, "you have albuterol—not using. you misused nebulizer." Id. (citing Dkt. No. 68 at 47). The plaintiff says that Taplin placed him on a waiting list for an appointment with Jeanpierre after Taplin heard the plaintiff wheezing on May 21, 2021. Id. at ¶58. He says he experienced "tightness and pain in [his] chest, and wheezing, trouble breathing" while he was on the waiting list. Id. The plaintiff says he again wrote to the HSU, "including Jeanpierre and Manager 'Robert Weinman [sic] to be 'seen and assessed' and even complainted [sic] of not being seen." Id. at ¶208 (citing Dkt. No. 68 at 41–48). He asserts that "nurses was lying in May of 2021 and falsifying [his] medical records saying [he] was being assessed and seen by ACP—when [he] wasn[']t." Id. at ¶209 (citing Dkt. No. 33–38).

The plaintiff says that on June 1, 2021, he wrote to the HSU complaining that "it's been over 2 weeks and [he] still have'nt [sic] been seen by Jeanpierre by which Weinman replied 3 day's [sic] later saying seen today." Id. at ¶210 (Dkt. No. 68 at 30). He says HSU manager Weinman "'omitted from [his] medical records how he saw [the plaintiff] at door front while [he] was in [his] cell and [he] told him [he] was on the verge of an asthma attack.'" Id. at ¶211. He says Weinman admitted that the plaintiff told him this in his admissions. Id. (citing Dkt. No. 95 at 106). The plaintiff wrote to Jeanpierre on June 2, 2021 because, among other issues, he was "'on the verge of an asthma attack– tightness in [his] chest and pain in [his] stomach its hot in these rooms." Id. at

¶212 (citing Dkt. No. 95 at 62). Jeanpierre responded the next day, "already addressed please use your Wixela." Id.

The plaintiff avers that on June 2, 2021, he told Ahlborg he was "having tightness and pain in [his] chest, and trouble breathing–wheezing and was on the verge of an asthma attack due to Jeanpierre not seeing [him]." Id. at ¶59. He asked Ahlborg to assess him, and Ahlborg asked the plaintiff if he had "been using [his] inhaler." Id. at ¶213. The plaintiff says that he told Ahlborg that he used his Albuterol inhaler, but it was not working. Id. He says Ahlborg "stated he dont [sic] believe [the plaintiff], and he walked off." Id. at ¶¶59, 213. The plaintiff says he "wrote to Weinman to complaint [sic] about Ahlborg and his conduct." Id. at ¶213 (citing Dkt. No. 68 at 27). Weinman responded by noting that the plaintiff had seen Ahlborg that day and that the plaintiff's provider "ordered new medication" for the plaintiff to try. Id. at ¶214 (citing Dkt. No. 68 at 27). The plaintiff says Weinman "did nothing to Ahlborg conduct." Id. The plaintiff maintains that on June 4, 2021, he suffered an asthma attack. Id. at ¶215. He cites a declaration from incarcerated person Dexter Ewing, but this document is faint and largely illegible. Id. (citing Dkt. No. 88-1 at 85–88). He also cites his medical notes from Taplin, who did not report the plaintiff as having had an asthma attack. Id. (citing Dkt. No. 68 at 54–56).

The plaintiff avers that Weinman assessed the plaintiff's asthma later that week and "noted [he] was wheezeing [sic]." Id. at ¶217. He avers that "Weinman falsified [his] medical records by stating no wheezing or other noises

heard throughout lungs." Id. (citing Dkt. No. 68 at 51–52). He says Weinman also falsified his records "when he stated [the plaintiff] stated inhalers worked 'when [the plaintiff] said they did not.'" Id. He insists that he told Weinman "inhalers didn't work," and that he had another asthma attack later in June 2021. Id. at ¶¶217–218. The plaintiff further claims that Ahlborg falsified his medical records when he wrote that the plaintiff "talked in a loud voice, and without pause" and told him "to get his faggot ass away from [his] cell door." Id. at ¶219. The plaintiff says that "Waupun nurse's [sic] have a history of falsing [sic] inmates medical records." Id. He cites declarations from other incarcerated persons in support of this claim. Id.

The plaintiff says that on June 4, 2021, Jeanpierre "never pulled [him] out to assess [his] asthma"; he says she and Weinman only "came to [his] cell front to talk to [him] about a new inhaler." Id. at ¶220. He again alleges that they falsified his medical records "by not listening to [his] lungs." Id. The plaintiff says he wrote to Jeanpierre on June 6, 2021 about not pulling him out of his cell to assess him two days earlier. Id. at ¶221. He says Jeanpierre replied, "no nebulizer." Id. (citing Dkt. No. 88-1 at 5). The plaintiff says that Jeanpierre "never saw [him] in person to assess [his] asthma, peak flow, vitals, blood pressure, or auscultation of [his] lungs, nor an appointment in May 2021 nor 2021 of June." Id. at ¶222. He says she did not see him "in person" until July 29, 2021, "when [he] was on hunger strike." Id. He claims that Weinman "failed to act–intervene despite [him] writing to him complaining to be seen for [his] asthma." Id. at ¶223. He says that Ahlborg "failed to provide [him]

adequate medical needs [*sic*] despite [him] telling Ahlborg [he was] having trouble breathing–tightness in [his] chest–pain and on the verge of an asthma attack." <u>Id.</u> He claims that Jeanpierre failed "to provide adequate medical care despite [him] writing to her to be seen for [his] asthma and 2 nurses scheduling an appointment to see her[,] which she never pulled [him] out to see [him]." <u>Id.</u>

The plaintiff asserts that Jeanpierre "lied under perjury" because in her responses to his rephrased request for admissions, she denied receiving or reviewing an HSU request in May through August 2021 in which he asked if "advare and wixela are similar." Dkt. No. 92 at ¶4 (citing Dkt. No. 95 at 99, 101). The plaintiff says that on April 13, 2021, Jeanpierre responded to his HSU request "by stating that they are equal." <u>Id.</u> at ¶5 (citing Dkt. No. 95 at 68). He also says that Jeanpierre lied about Ahlborg "ma[king] her aware that [the plaintiff] was wheezing in in [*sic*] April 2021." <u>Id.</u> at ¶6. He cites an unreadable HSU request that he says he sent on April 6, 2021, in which he "made 'Jeanpierre' aware that 'nurse Ahlborg' saw [him] on 4-5-2021 and noted [he] was wheezing[,] inhaler not working." <u>Id.</u> at ¶7 (citing Dkt. No. 88-1 at 2). The plaintiff avers that Jeanpierre also lied about the plaintiff telling her that he took "advare inhaler when [he] was out in the world"; he says he notified her about this on April 12, 2021. <u>Id.</u> at ¶¶9–10. He cites "85.999 as medical records" in support, <u>id.</u>, but the court was unable to locate this document. The plaintiff says Jeanpierre further lied about the plaintiff telling her that his Dulera inhaler was not working in July 2021. <u>Id.</u> at ¶¶10–11. He says Jeanpierre also lied about whether he notified her in August 2021 about him

having asthma attacks, falsified his medical records and violated prison policy requiring her to "conduct auscultation of [his] lungs." Id. at ¶¶12–18.

The plaintiff avers that on June 2, 2021, he "inform[ed] Jeanpierre [he] was on the verge of an asthma attack." Id. at ¶22. He cites an HSU request he dated June 2, 2021, complaining about "nose bleed," allergies, trouble breathing, "weezing . . . on the verge of an asthma attack" and chest pain. Id. (citing Dkt. No. 95 at 62). Jeanpierre responded the next day, noted that the issue was "already addressed" and advised the plaintiff to "please use [his] Wixela." Dkt. No. 95 at 62. The plaintiff reiterates that Jeanpierre lied about responding to his various requests about needing a nebulizer, his inhaler not working and the treatment he took for his asthma "when [he] was out" "in the world" and saw his "real doctor." Dkt. No. 92 at ¶¶24–32.

The plaintiff next avers that Weinman "lied under perjury" about not finding an HSU request in which the plaintiff "told him [he] was on the verge of an asthma attack." Id. at ¶33. He does not cite an HSU request in which he told Weinman that. Id. He instead cites Weinman's response to the plaintiff's rephrased requests for admission in which Weinman admits that the plaintiff submitted an HSU request on June 2, 2021, "stating that he was 'on the verge of a[n] asthma attack.'" Id. (citing Dkt. No. 95 at 106). But Weinman denies "having personally received or reviewed" that request. Dkt. No. 95 at 106. The plaintiff accuses Weinman of falsifying his medical records and reiterates that Jeanpierre also falsified his records. Dkt. No. 92 at ¶¶35, 38–41.

The plaintiff avers that Ahlborg "lied under perjury" regarding whether nursing protocol required him to "pull [the plaintiff] out" of his cell to assess his asthma. Id. at ¶¶48–49. He insists that Ahlborg's declaration contradicts what Ahlborg said in his discovery responses regarding whether a nurse must assess an asthmatic patient. Id. at ¶50. The plaintiff asserts that Ahlborg falsified his medical records and lied in his declaration about what the plaintiff said on June 2, 2021, because Ahlborg did not write a conduct report about the plaintiff's vulgar comments. Id. at ¶54.

The plaintiff spends several paragraphs detailing his childhood and family history of asthma and treatment. Id. at ¶¶62–67. He says he took a steroid inhaler called "advare," which he claims "is similar to the generic version of Wixela." Id. at ¶65. In support, he cites pages of his psychological and medical records from 2002. Id. (citing Dkt. No. 95 at 31–38). These records note that the plaintiff has asthma and at one point was taking Flonase nasal spray. Dkt. No. 95 at 33, 37. The plaintiff avers that as an adult, he was hospitalized for asthma and prescribed a nebulizer to use at home. Dkt. No. 92 at ¶¶68–70. He cites "ex. 40.999" in support, but that is a request for information he submitted on July 6, 2022. Id. (citing 88-1 at 19).

The plaintiff details the asthma treatment he received when he was at Columbia Correctional Institution in 2019. Id. at ¶¶71–79. He says he was given a nebulizer when his inhalers and other medications were not working. Id. at ¶¶72–73. He says he was allowed to keep the nebulizer in his cell at Columbia. Id. at ¶74. The plaintiff avers that his "Asthma do worstening [*sic*] in

hot wheather [*sic*] and that inhalers was non effective," which is why he used a nebulizer. Id. at ¶76 (citing Dkt. No. 95 at 76). He says that when he was transferred to Waupun for assaulting staff, he took his Albuterol inhaler but had to keep it outside of his cell while he was on control status. Id. at ¶79. The plaintiff says that Nurse York performed an intake screening on November 13, 2019, and the plaintiff reported his history of asthma. Id. at ¶¶81–82. He says that York gave him an Albuterol inhaler to use until he saw a provider, so he had two inhalers. Id. at ¶¶84–85. He says that she omitted from his medical records that he told her he previously was provided a nebulizer. Id. at ¶84. He says that Dr. Manlove ordered him a third Albuterol inhaler on November 21, 2109. Id. at ¶86. The plaintiff says he always keeps "3 plus more albuterol inhalers" on him and has since his childhood. Id. at ¶87.

The plaintiff avers that he previously was prescribed "Wixela–Advare" when he was a teenager and again at Waupun in 2020. Id. at ¶¶96–97. He again says that Wixela "is a generic version of advare." Id. at ¶97. In support of that statement, he cites a page of the defendants' exhibits. Id. (citing "ex 1000 at 0084" (Dkt. No. 68 at 84)). This document—a page of the plaintiff's medical records—says nothing about Wixela or "advare." Dkt. No. 68 at 84.

The plaintiff avers that HSU staff omitted him "telling them [he] took Wixela" when he was not incarcerated. Id. at ¶100. He says he told APNP Moore that he felt "like an experiment" because she was prescribing him medication that he "took as a teen that didn[']t work." Id. (citing Dkt. No. 68 at 6). The plaintiff avers that Nurse Haseleu omitted from his records that he told her his

outside doctor had discontinued Wixela "due to noneffectiveness." Id. at ¶102 (citing Dkt. No. 68 at 62). He also says that Jeanpierre omitted from his March 24, 2021 records that he told her "how [he] took advare when [he] was out in the world, and how it didn[']t work on [him] and [his] Dr discontinued[] it." Id. at ¶103 (citing Dkt. No. 68 at 53). The plaintiff says this is why he told Jeanpierre on April 12, 2021 that Wixela "'never' worked." Id. at ¶014 (citing Dkt. No. 95 at 66). The exhibit he cites is an HSU request dated April 12, 2021, in which the plaintiff wrote that he had "been complaining that Wixela never worked since last June summer." Dkt. No. 95 at 66. The plaintiff noted that he had taken "Advare when [he] was out" and that his "real DR discontinue [his] Advare [and he] had a nebulizer." Id. This request was forwarded to Jeanpierre, who wrote simply, "ordered." Id. The plaintiff cites another HSU request he sent the same day asking if Wixela and Advare are "equivalent." Id. at 68. This request was forwarded to Jeanpierre who responded, "they're both synthetic steroids [and] long acting[. T]hey are equal." Id.

The plaintiff avers that HSU staff "is not educated nor trained to give advice on inhaler being stored in certain room temperature." Dkt. No. 92 at ¶¶108–112. He bases this statement on a response Weinman to the plaintiff's September 2022 HSU request, in which the plaintiff asked about the proper temperature to store an inhaler. Id. at ¶108 (citing Dkt. No. 95 at 58). Weinman responded, "We are not educated or trained to give a response. You may write pharmacy and we can forward." Id. The plaintiff says he sent a letter to the pharmacy on September 25, 2022, to ask about keeping his inhaler "stored at

35

room temperatures . . . because there are times when its [*sic*] real hot in the room – humid – muggy it don't work." Id. at ¶109 (citing Dkt. No. 88-1 at 72). The plaintiff says that he "do[esn't] believe it was forward[ed] to their pharmacy," and he "never heard back from that pharmacy" in response to his letter. Id. at ¶¶109, 111. The plaintiff wrote a similar letter to APNP Jessica La'Mar on April 9, 2023, asking about inhalers stored in "hot–humid–muggy" temperatures. Id. at ¶112 (citing Dkt. No. 88-1 at 73). He does not say if he received a response. Id.

The plaintiff attached what he says is information about the Wixela inhaler, which states "Do not use a spacer device with this inhaler." Id. at ¶114 (citing Dkt. No. 95 at 51). This exhibit is labeled "Fluticasone Propionate, Salmeterol Xinafoate Inhalation powder." Dkt. No. 95 at 51. It does not mention Wixela, and the plaintiff has identified no evidence that Wixela is the same as the medication discussed in this document. The plaintiff separately cites an exhibit labeled "Albuterol Pressurized inhalation, suspension," which advises to store the medication "at room temperature between 15 and 30 degrees C (59 and 96 degrees F)." Dkt. No. 92 at ¶119 (citing Dkt. No. 95 at 50).

The plaintiff says that his asthma is triggered by a host of issues, including dust, smoke, "chemical spray, certain cold temperatures, when it[']s hot-humid-muggy in wheather [*sic*]" and when he is "emotionally upset about something." Id. at ¶123. He recounts that the defendants included his list of triggers in their exhibits. Id. (citing Dkt. No. 68 at 3, 6, 52–53). He also says that each defendant admitted in their responses to the plaintiff's rephrased or

readdressed requests for admissions that "it gets hot in the summertime in RHU" and that "it can get humid in the RHU in the summertime." Id. at ¶¶124–130. The plaintiff cites a response to a request for information he sent to "EMC" about the hot conditions in his cell and a request to turn up the air conditioning; "EMC" responded, "Housing units do not have AC. Just air flow." Id. at ¶131 (citing Dkt. No. 88-1 at 4).

The plaintiff avers that "a nebulizer has been proven by experts that a nebulizer [sic] can be easier to use and more effective than a[n] inhaler." Id. at ¶132. In support he cites a web address—www.Med4home.com – statistics—but does not provide a document from that website. Id. He also says that "every time [he] used a nebulizer treatment rather [sic] as a child, teen Adult, [he] had better results versus using a[n] inhaler." Id. at ¶133. He says that when he was at Columbia Correctional, "it was reported" that the nebulizer was more effective than an inhaler. Id. at ¶134 (citing Dkt. No. 95 at 76). He lists various times that the defendants or other Waupun medical staff provided him nebulizer treatment and "reported [that he] feel[s] better." Id. at ¶¶134–141. He also cites a December 15, 2022 visit he had with "[his] physician Diana Simmons, in which she orally stated to [him] that a nebulizer is more effective than a[n] inhaler and spacer." Id. at ¶142. The document he cites in support is an HSU request that does not mention Dr. Simmons. Id. (citing Dkt. No. 88-1 at 28). He asserts that HSU staff at Waupun "disregarded and omitted" from his medical records that an inhaler with a spacer is less effective at controlling

his asthma than a nebulizer. Id. at ¶147. He cites no evidence in support of this assertion.

The plaintiff says that on December 1, 2022, he saw Simmons, who diagnosed him with "moderate to serve [*sic*]—persistent asthma without asmaticus." Id. at ¶¶172–172 (citing Dkt. No. 88-1 at 30–31). He nonetheless says that she mistakenly "omitted severe" from his medical records. Id. at ¶173 (citing Dkt. No. 88-1 at 30–34). The plaintiff then details treatment he received for his asthma in February and March 2023. Id. at ¶¶176–182. The plaintiff accuses "Doctors–Physicians, Nurses" of violating "chapter med 10" by their "unprofessional conduct." Id. at ¶¶183–186. He does not specify which defendants, if any, allegedly violated these rules.

The plaintiff avers that Waupun's HSU "has a history of fabricating inmates medical records, omitting important details in inmates medical records." Id. at 40. He cites declarations from other incarcerated person in support of this statement. Id. at ¶¶187–188 (citing Dkt. No. 88-1 at 84; Dkt. No. 95 at 5–8). The plaintiff cites various places where he says HSU staff "fabricated [his] medical records." Id. at ¶¶189–197.

The plaintiff contests that nebulizers could risk spreading COVID-19. Id. at ¶203. He says that in 2020 to 2021, "it was no reports of inmates or staff catching covid19 due to [him] using nebulizer in 'RHU'." Id. at ¶204. He cites unlabeled documents in his exhibits that generally discuss risk factors for COVID-19 in institutional settings. Id. at ¶203 (citing Dkt. No. 95 at 9–25).

The plaintiff avers that "inhalers are now [*sic*] effective when not stored in room temperature as instructed on inhaler boxes [*sic*]." Id. at ¶228. He cites no evidence in support of this statement. He says that "in the pass [*sic*]" he wrote to HSU complaining that he needed nebulizer treatment and asking nurses to come to his cell. Id. at ¶229. He says that "at time [he] couldn[']t received [*sic*] medical attention due to staffing shortage." Id. at ¶230. He cites an HSU request from August 2022. Id. (citing Dkt. No. 88-1 at 26). He discusses other instances in 2022 when he reported issues with his asthma but "nothing was done." Id. at ¶¶231–233. He says the HSU fabricated his records and omitted important details "just as in 2020, and 2021, may and June 2021." Id. at ¶233.

## II. Discussion

### A. Summary Judgment Standard

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Neither argument nor

speculation is enough to avoid summary judgment. See Ammerman v. Singleton, 817 F. App'x 265, 268 (7th Cir. 2020) (citing Herzog v. Graphic Packaging Int'l, Inc., 742 F.3d 802, 806 (7th Cir. 2014)). Instead, the plaintiff, as the non-moving party, "needs to come forward with *evidence*" that would allow a jury to return a verdict in his favor if the case proceeded to trial. See Beatty v. Olin Corp., 693 F.3d 750, 754 (7th Cir. 2012) (emphasis in original).

B.    Eighth Amendment

The court analyzes a plaintiff's claim that prison staff were deliberately indifferent to his serious medical needs under the Eighth Amendment's cruel and unusual punishments clause. Estelle v. Gamble, 429 U.S. 97, 104 (1976). An Eighth Amendment claim consists of both objective and subjective components. Farmer v. Brennan, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must show that he "is incarcerated under conditions posing a substantial risk of serious harm." Id. To satisfy the subjective component, the plaintiff must demonstrate that the defendants had a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834. A prison official shows deliberate indifference when she "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015) (citing Farmer, 511 U.S. at 837). "The standard of deliberate indifference 'requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk.'" Stewart v. Wexford Health

40

Sources, Inc., 14 F.4th 757, 763 (7th Cir. 2021) (quoting Huber v. Anderson, 909 F.3d 201, 208 (7th Cir. 2018)). The evidence must show the defendant's "actual, personal knowledge of a serious risk, coupled with the lack of any reasonable response to it." Ayoubi v. Dart, 724 F. App'x 470, 474 (7th Cir. 2018) (citing Farmer, 511 U.S. at 837, 844–45).

In the context of a claim of deliberate indifference against a medical provider, the subjective component requires the plaintiff to show that the provider's treatment decision was "so inadequate that it demonstrated an absence of professional judgment." Stewart, 14 F.4th at 763 (quoting Johnson v. Dominguez, 5 F.4th 818, 826 (7th Cir. 2021)). Put another way,

> "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" [Pyles v. Fahim, 771 F.3d 403, 409 (7th Cir. 2014)] (quoting Sain v. Wood, 512 F.3d 886, 894–95 (7th Cir. 2008)). "To infer deliberate indifference on the basis of a [medical professional's] treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." Norfleet v. Webster, 439 F.3d 392, 396 (7th Cir. 2006).

Id.

C.    Analysis

The court stated in the screening order "'that asthma can be, and frequently is, a serious medical condition, depending on the severity of the attacks.'" Dkt. No. 9 at 5 (quoting Board v. Farnham, 394 F.3d 469, 484 (7th Cir. 2005) and citing Garvin v. Armstrong, 236 F.3d 896, 898 (7th Cir. 2001)). The defendants acknowledge that, for purposes of summary judgment, the plaintiff's asthma constitutes an objectively serious medical condition. Dkt. No.

77 at 11. They assert, however, that the record contains no evidence that would allow a reasonable jury to find that the defendants were deliberately indifferent to his asthma. Id.

1.    *Plaintiff's Medical History*

The defendants provide significant background information about Waupun HSU's treatment of the plaintiff's asthma between November 2019 (when the plaintiff arrived at Waupun) and May through June 2021, when the events relevant to this lawsuit occurred. This background shows the HSU's efforts to control the plaintiff's asthma despite the COVID-19 pandemic, the plaintiff's complaints about certain treatments not working and his conduct reports for misusing the nebulizer and threatening staff during nebulizer treatments. It is undisputed that the plaintiff's conduct, and the conduct reports that followed, led HSU staff to discontinue the plaintiff's prescription to have a nebulizer in his cell. Instead, he was permitted to keep inhalers in his cell and could request nebulizer treatment from medical staff if he believed the inhalers were not effectively controlling his asthma symptoms. He received another conduct report for threatening staff, which further interfered with medical staff's ability to provide him his requested treatment.

The defendants also presented evidence that the plaintiff was not using his inhalers as directed and then complaining that they were ineffective. For example, the plaintiff claimed that he regularly was using his inhalers but did not request refills as often as he would need to if he were using them as directed. The plaintiff disputes that he was not taking his medication as directed and

77 at 11. They assert, however, that the record contains no evidence that would allow a reasonable jury to find that the defendants were deliberately indifferent to his asthma. Id.

1.    *Plaintiff's Medical History*

The defendants provide significant background information about Waupun HSU's treatment of the plaintiff's asthma between November 2019 (when the plaintiff arrived at Waupun) and May through June 2021, when the events relevant to this lawsuit occurred. This background shows the HSU's efforts to control the plaintiff's asthma despite the COVID-19 pandemic, the plaintiff's complaints about certain treatments not working and his conduct reports for misusing the nebulizer and threatening staff during nebulizer treatments. It is undisputed that the plaintiff's conduct, and the conduct reports that followed, led HSU staff to discontinue the plaintiff's prescription to have a nebulizer in his cell. Instead, he was permitted to keep inhalers in his cell and could request nebulizer treatment from medical staff if he believed the inhalers were not effectively controlling his asthma symptoms. He received another conduct report for threatening staff, which further interfered with medical staff's ability to provide him his requested treatment.

The defendants also presented evidence that the plaintiff was not using his inhalers as directed and then complaining that they were ineffective. For example, the plaintiff claimed that he regularly was using his inhalers but did not request refills as often as he would need to if he were using them as directed. The plaintiff disputes that he was not taking his medication as directed and

instead claims that his inhalers did not work because it was hot, muggy or humid in his cell. But the plaintiff is not a medical expert, has no medical training and is not qualified to testify about the specifics of inhalers and in what conditions they might fail to work. See Federal Rule of Evidence 701, 702. Even if the plaintiff is right that hot temperatures can hinder an inhaler's effectiveness, the record evidence shows only that *sometimes* RHU cells get hot, humid or muggy. The plaintiff provided no evidence proving that on the dates in May and June 2021 cited in his complaint it *was* hot, humid or muggy in his cell or the RHU in general. His suggestion that the weather conditions affected his inhalers is speculative at best—it is not competent evidence sufficient to raise a factual dispute about the efficacy of his inhalers. See Cambronero v. Meli, Case No. 22-2103, 2023 WL 4946724, at *2 (7th Cir. Aug. 3, 2023) (citing Pulera v. Sarzant, 966 F.3d 540, 550–51 (7th Cir. 2020)).

The undisputed evidence shows that the defendants responded to the plaintiff's repeated complaints about his asthma. Beginning in July or August 2020, they completed only visual inspections of the plaintiff because he had repeatedly threatened and assaulted staff who were conducting physical assessments. As this court previously has held in another of the plaintiff's cases involving medical treatment of his asthma, the plaintiff cannot claim that the defendants were deliberately indifferent by not providing a physical assessment when it was his own behavior that prevented them from being able to do so safely. See Durley v. Taplin, *et al.*, Case No. 20-cv-1890-pp, Dkt. No. 103 at 28–29 (explaining that nurse's decision not to give the plaintiff nebulizer

treatment when he required a three-man escort, had an inhaler in his cell and was yelling profanities at the nurse "was not deliberate indifference; it was a reasoned analysis of the security situation and the lack of visible or audible evidence that the plaintiff was having a severe asthma attack").

The evidence also shows that a physical assessment was not necessary to evaluate the plaintiff's condition. Nurse Ahlborg avers that a visual inspection from the front of the cell was sufficient to determine whether the plaintiff was having an asthma attack or needed nebulizer treatment because medical staff could hear his breathing and determine if he was showing any signs of distress. On one occasion, a correctional officer was able to determine that the plaintiff was struggling to breathe just by walking by his cell. See Dkt. No. 68 at 54–56. There is no record evidence that an in-person physical assessment is necessary to determine if a patient is suffering from an asthma attack and needs special treatment. Nor is there record evidence that the defendants failed to provide adequate medical treatment by assessing the plaintiff at his cell front instead of removing him or "pulling him out" from his cell.

### 2. *Dr. Jeanpierre*

The undisputed evidence shows that Dr. Jeanpierre assessed the plaintiff in person on only a few occasions. She first saw him on March 24, 2021. During this visit, she noted that the plaintiff was not wheezing and was speaking in full sentences. She determined that his asthma was stable and directed him to continue using the inhalers he had been provided. Jeanpierre

avers that she considered several factors when denying his request for a nebulizer, including that he had no issues that might make it difficult for him to use the inhaler, the increased risk of COVID-19 transmission from using a nebulizer and the plaintiff's known history of abusing his nebulizer when provided one. The plaintiff claims that he told Jeanpierre during this appointment that he had taken a medication similar to Wixela before his incarceration, but that it did not work. There is no evidence of this in the record, and the plaintiff cites no evidence in support of his assertion that Jeanpierre omitted it from his records. The plaintiff also disputes that using the nebulizer increased the risk of spreading COVID-19. But the evidence he cites in support of this dispute only generally discusses COVID-19 in institutions. It says nothing about the risk of spreading the virus through nebulizer use. And the plaintiff is not a medical professional, so he is not qualified to provide evidence about practices that do or don't increase the risk of COVID-19 spread.

On May 3, 2021, the plaintiff saw Nurse Taplin for complaints of wheezing, that he was using his Albuterol inhaler too much and that his Wixela inhaler was not working. Taplin noted that the plaintiff was wheezing some but was not in distress. He forwarded to Jeanpierre the plaintiff's concern about his Wixela inhaler not working. Jeanpierre did not respond to that message, but the plaintiff does not say that he suffered an asthma attack immediately after his appointment with Taplin. Jeanpierre did respond to the plaintiff's similar HSU request from May 20, 2021 about trouble breathing and needing

nebulizer treatment. Jeanpierre denied his request because the plaintiff's records showed that he had not been taking his Albuterol as directed and had misused his nebulizer.

On June 4, 2021, Jeanpierre (and HSU manager Weinman) saw the plaintiff at his cell, explained that they had ordered him new medication (Dulera) and advised him to take this medication as directed. Jeanpierre noted that the plaintiff agreed with the proposed course of action and showed no signs of difficulty breathing. Two weeks later, the plaintiff confirmed that the new medication was working when he sent the HSU a request that said, "Wow Dulera inhaler works." Dkt. No. 68 at 19.

The undisputed evidence would not allow a reasonable jury to find that Jeanpierre disregarded the plaintiff's concerns about his asthma in May and June 2021. The plaintiff saw nurses for his asthma several times during these months, but he saw Jeanpierre only once. The plaintiff sent HSU requests about his asthma, and Jeanpierre responded to a few of those. She noted that the plaintiff had not been taking his prescribed medication as directed and reminded him that he was not permitted to keep a nebulizer in his cell. Jeanpierre sometimes was short in her response to the plaintiff's written requests. Nonetheless, she took notice of the plaintiff's complaints about his medication and changed it when he complained that it was not working, even though she believed he was not taking his prescribed medication as directed to determine its true effectiveness. Her flexibility to try other options resulted in finding effective treatment for the plaintiff's symptoms with Dulera, which she had to have

46

approved through the institution's pharmacist. Jeanpierre's reasoned decision to alter the plaintiff's course of treatment (despite the plaintiff's refusal to follow it as prescribed) and her efforts to seek out an alternate medication belie the plaintiff's claim that she disregarded his asthma and ignored his concerns. See Zaya v. Sood, 836 F.3d 800, 805 (7th Cir. 2016) ("By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment.").

The plaintiff claims that Jeanpierre delayed seeing him immediately in May 2021 and his symptoms worsened. But there is no evidence that the plaintiff's symptoms worsened between May 3 and 20 or between May 20 and June 4, 2021, when Jeanpierre saw the plaintiff. The plaintiff does not claim that he suffered an asthma attack during that time, though he does say that he suffered one after he saw Jeanpierre on June 4, 2021. The evidence also shows that Jeanpierre does not set her own schedule for seeing patients; triaging nurses scheduled appointments based on patient needs as expressed in their HSU requests. Jeanpierre cannot be held responsible for not performing someone else's job. See Burks v. Raemisch, 555 F.3d 592, 595 (7th Cir. 2009) (explaining that "no prisoner is entitled to insist that one employee do another's job"). There also is evidence that Jeanpierre *was* scheduled to see the plaintiff sooner on June 3, 2021, but a disturbance in the RHU forced a delay of that appointment. Dkt. No. 68 at 6.

The plaintiff complains that Jeanpierre did not pull him out of his cell and provide nebulizer treatment. But it is undisputed that HSU staff (other than Jeanpierre) discontinued the plaintiff's nebulizer prescription because of his own conduct. The evidence shows that Jeanpierre reminded the plaintiff that the HSU would provide him a nebulizer "on a necessary basis," dkt. no. 68 at 11, and his medical records show that nurses followed that plan and administered nebulizer treatment when they deemed it necessary. There is no evidence that in or around May or June 2021, any medical professional determined that the plaintiff required nebulizer treatment to control his asthma symptoms. The plaintiff cites only his own HSU requests in support of his statement that a nebulizer is more effective. See Dkt. No. 88-1 at 28, 30–31. As the court has explained, the plaintiff is not a medical expert and is not competent to testify about what treatments are more effective to control asthma. See Fed. R. Evid. 701, 702. Jeanpierre avers that a nebulizer is an *alternative* to an inhaler, but she does not say that either is more effective. She avers that patients often prefer inhalers because they are portable and more quickly deliver medicine to the lungs. The plaintiff's medical records show that he *preferred* nebulizer treatment and refused to take his inhalers as prescribed when the HSU discontinued his nebulizer. But the plaintiff does not have the right to demand a specific or preferred course of treatment when other treatment was provided and available, especially because it was his own behavior that forced the HSU to change the method it used to safely treat his asthma. See Burton v. Downey,

805 F.3d 776, 785 (7th Cir. 2015); Forbes v. Edgar, 112 F.3d 262, 267 (7th Cir. 1997).

The plaintiff spends several pages of his declaration discussing a medication that he says he took "in the real world," which he refers to as "advare." He says that that mediation did not work, and that Jeanpierre knew it did not work but still prescribed him Wixela, which is effectively identical to "advare." In support, he cites Jeanpierre's response to an interrogatory he sent in which Jeanpierre confirmed that "Wixela and Advair have the same active ingredients." Dkt. No. 95 at 119. Jeanpierre also told the plaintiff in response to an HSU request he sent in April 2021 that the two medications (Wixela and Advair) "are equal." Id. at 68. The plaintiff insists that this shows that Jeanpierre knew that the plaintiff previously had taken Advair and knew that it was ineffective, yet prescribed him an identical medication (Wixela) anyway. He asserts that this shows that Jeanpierre was deliberately indifferent to his asthma.

The medication Advair is mentioned only twice in the plaintiff's medical records—once in notes from an October 20, 2022 appointment with an offsite physician, during which he reported that he had previously tried Advair "without any benefit," dkt. no. 88-1 at 43, and a second time during a February 16, 2023 appointment with a different offsite physician, who noted that the plaintiff was "willing to try Advair HFA or generic equivalent," Id. at 66. There is no evidence that before he was incarcerated, a medical professional deemed Advair ineffective at controlling the plaintiff's asthma. The plaintiff even told the

49

doctor during the February 16, 2023 appointment that he would be willing to try Advair or a generic equivalent, which suggests that as of almost a year and a half ago he *did not* believe it would be ineffective.

Most important, there is no evidence that the plaintiff told Jeanpierre, or that she was aware in May and June 2021, that he had taken Advair previously without success. The evidence shows that Jeanpierre repeatedly *denied* that the plaintiff told her that he previously took Advair. In the same response to the plaintiff's interrogatories that he cites, the plaintiff asks Jeanpierre if he "ma[d]e [her] aware that [he] took advair inhaler when [he] was out in the world." Dkt. No. 95 at 120, ¶11. Defense counsel objected to the phrasing of this interrogatory, but Jeanpierre responded, "I do not recall." Id. In response the plaintiff's first requests for admission, Jeanpierre denied that the plaintiff had told her that he "use[d] to take Advare inhaler when [he] was out in the world." Id. at 129, ¶8. In response to the plaintiff's second requests for admission, Jeanpierre again denied that the plaintiff had "ma[d]e [her] aware, [he] took advare inhaler when [he] was out in the World." Id. at 142, ¶11. The plaintiff cites no evidence showing that when she prescribed him Wixela, Jeanpierre knew that he previously had taken Advair without success. She cannot be held deliberately indifferent for prescribing the plaintiff a medication that she did not know might be ineffective. Moreover, far from "persist[ing] in a course of treatment known to be ineffective," Greeno v. Daley, 414 F.3d 645, 655 (7th Cir. 2005), Jeanpierre changed the plaintiff's prescription to Dulera after he insisted that Wixela was not working.

The plaintiff has not provided evidence that would allow a reasonable jury to conclude that Jeanpierre was aware of but disregarded his asthma in May and June 2021. She is entitled to judgment as a matter of law.

### 3. *HSU Manager Weinman*

The same is true for HSU manager Weinman. The evidence shows that Weinman responded to some, but not all, of the plaintiff's HSU requests or requests for information. He responded only to the plaintiff's requests that a triaging nurse forwarded to him for his review. There is no evidence that Weinman saw any of the plaintiff's May or June 2021 requests that a nurse did not forward to Weinman for his review. He cannot be found deliberately indifferent for not responding to HSU requests that he never saw. Weinman also avers that he does not dictate a physician's schedule, so he cannot be held responsible for not scheduling an earlier appointment with a doctor in response to the plaintiff's HSU requests or complaints. See Burks, 555 F.3d at 595.

The plaintiff claims that Weinman failed to intervene in response to his June 1, 2021 HSU request in which he said that he felt like he was on the verge of an asthma attack. But the undisputed evidence shows that Weinman did not see this request until three days later, June 4, 2021. By that time, two nurses had seen and assessed the plaintiff for his complaints of difficulty breathing—Ahlborg on June 2 and Taplin on June 4. The court will discuss Ahlborg's June 2, 2021, assessment below (see *infra*, Section II.C.4). Taplin provided the plaintiff nebulizer treatment in the morning on June 4, 2021 and Ahlborg did the same later that afternoon.

Weinman and Dr. Jeanpierre saw the plaintiff around noon the same day (June 4, 2021) to inform him that they were prescribing him a new, non-formulary medication for his asthma. Weinman noted the plaintiff's history of abusing his nebulizer, which was why the HSU no longer allowed him to have a nebulizer in his cell. Weinman also reviewed the plaintiff's medical administration record, which showed that the plaintiff consistently had refused to take his medication as prescribed, so it was not known whether it was having its full effect. Weinman reminded the plaintiff that he could contact the HSU if he had an emergency, including a need for nebulizer treatment. As the court had discussed, the plaintiff later wrote to the HSU to tell them, "Wow Dulera inhaler works." Dkt. No. 68 at 19. Weinman responded to this note, thanked the plaintiff for the information and advised him to "let HSU know if something changes." Id. The same day, after all these interventions, Weinman responded to the plaintiff's June 1, 2021 HSU request and noted that medical staff had seen and treated him that day. He also responded to a request for information the plaintiff submitted on June 1, 2021, and noted that HSU staff were seeing the plaintiff based on his requests for treatment and medical staff's judgment.

The record evidence would not allow a reasonable jury to conclude that Weinman was deliberately indifferent to the plaintiff's asthma or his HSU requests about his treatment. The evidence shows that Weinman responded to any of the plaintiff's May and June 2021 requests forwarded to him by a triaging nurse, saw the plaintiff on at least one occasion to discuss alternate steps that

HSU staff were taking to address his asthma and followed up with the plaintiff about the success of that new medication in controlling his asthma. There is no evidence suggesting that Weinman ignored the plaintiff's requests that were forwarded to him, disregarded the plaintiff's concerns or failed to intervene in an instance where medical staff were not providing proper or adequate treatment.

There are two events that the defendants do not address but that the court finds worth discussion. First, Weinman avers that as HSU manager, he does not evaluate, diagnose, treat "or have any direct patient care contact with" incarcerated persons. Dkt. No. 75 at ¶6. Yet the plaintiff's medical records show that Weinman *did* personally see the plaintiff late in the day on June 5, 2021 for a nursing triage. Dkt. No. 68 at 51–52; Dkt. No. 73 at ¶68. He assessed the plaintiff, who said he had benefitted from using his inhaler. Dkt. No. 68 at 52. Weinman does not address this triage visit or explain why he, rather than other nursing staff, assessed the plaintiff. These records contradict Weinman's assertion that he has no direct patient care with incarcerated persons. But this contradiction does not create a genuine dispute of fact on any material issue because the complaint does not mention this assessment, and the plaintiff did not seek to proceed against Weinman for the care he personally provided on June 5, 2021. The complaint's allegations end with the asthma attack that the plaintiff says he suffered on June 4, 2021. Dkt. No. 1 at 3. Weinman also avers in his declaration that he is a registered nurse, and the plaintiff asserts that HSU staff told him that they had staffing issues. See Dkt. No. 88-1 at 26. It is possible that Weinman simply stepped in to triage an

incarcerated person's complaint when no one else was available. The court finds that this encounter is not relevant to the claims at issue in this lawsuit, which may be why the defendants did not discuss it.

The second instance also is outside the range of relevant dates for the plaintiff's claims. On June 7, 2021, the plaintiff sent an HSU request asking if he was still on the list to see Jeanpierre after he had what he described as his June 4, 2021 asthma attack, but no one responded to this request. Dkt. No. 68 at 25. Weinman acknowledges this request in his declaration and avers that he does not know why no one responded to it "or forwarded to the appropriate person for a response." Dkt. No. 75 at ¶54. It is not clear what happened with this request. But a single instance of a missed HSU request among the dozens of HSU requests and requests for information that the plaintiff filed in May and June 2021 does not suggest deliberate indifference. As Weinman explains, a triaging nurse would have reviewed this request and determined whether to forward it to Weinman or respond to the request. There is no evidence showing who was triaging HSU requests on June 4, 2021. The only nurse who is a defendant in this case is Ahlborg, and the evidence shows he did not respond to *any* of the plaintiff's HSU requests in May and June 2021. See Dkt. No. 74 at ¶6. Even if Ahlborg were the triaging nurse on June 4, 2021, at most he would have been negligent for missing or not responding to this single request. The plaintiff is not proceeding on a state-law claim of negligence, and negligence is not enough to violate the Eighth Amendment. See Farmer, 511 U.S. at 835–36; Stewart, 14 F.4th at 763.

A reasonable jury could not conclude that Weinman was aware of but disregarded the plaintiff's written requests about his asthma treatment in May and June 2021. The evidence does not show that he personally saw or responded to any of the plaintiff's May 2021 requests. Weinman timely responded to the plaintiff's June 2021 requests, spoke with the plaintiff in person about his course of treatment and addressed his concerns. Weinman is entitled to summary judgment as a matter of law.

### 4. *Nurse Ahlborg*

The plaintiff disputes that on June 2, 2021, Nurse Ahlborg pulled him out of his cell to conduct a physical assessment. But Ahlborg has not averred that he did that. He avers that he visually assessed the plaintiff from outside of his cell for a minute while the plaintiff was watching television, unaware that Ahlborg was assessing him. Ahlborg then spoke with the plaintiff, who was able to speak in long, full sentences without pausing. The plaintiff claimed that his inhaler was not working and that he needed to be pulled out of his cell and given nebulizer treatment. Ahlborg noted that the plaintiff was not in respiratory distress, was able to speak clearly without pauses and showed a normal respiratory rate, which Ahlborg measured from outside of the cell before speaking with the plaintiff. The plaintiff then called Ahlborg a derogatory term and told him to get away from the plaintiff's cell.

In his complaint, the plaintiff provided a different version of these events, and he reiterates those allegations in his declaration. He claims that Ahlborg said only that he did not believe the plaintiff when the plaintiff told Ahlborg

that he was having trouble breathing and then walked away from the plaintiff's cell. The plaintiff disputes using the derogatory term or telling Ahlborg to get away from his cell. The plaintiff claims that Ahlborg falsified his medical records and is lying about what happened during this interaction. He says that two days after this interaction, he suffered an asthma attack.

Even discounting the plaintiff's insistence that his medical records are fabricated, see infra, Section II.C.6, the plaintiff's declaration providing his version of the events from June 2, 2021 creates a dispute of material fact. The competing evidence could allow the jury to reach one of two conclusions—that Ahlborg assessed the plaintiff and reasonably concluded that he did not require emergency nebulizer treatment; or that Ahlborg disregarded the plaintiff's statement that he was having trouble breathing and left his cell without even visually assessing him. It is not the court's role to decide which of the competing versions of the facts is the correct one or which of the parties is more credible. Those are decisions for a jury to make. See Omnicare, Inc. v. UnitedHealth Grp., Inc., 629 F.3d 697, 704–05 (7th Cir. 2011) ("[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting evidence or make credibility determinations, both of which are the province of the jury." (quotation marks and internal citations omitted)).

The court will deny summary judgment for Ahlborg on the plaintiff's Eighth Amendment claim regarding their interaction on June 2, 2021. The court clarifies that this relates only to the plaintiff's allegations against Ahlborg and only to the events that occurred on June 2, 2021.

5. *Qualified Immunity*[2]

The defendants assert that even if the court determines there is a genuine dispute of fact on the plaintiff's Eighth Amendment claims, they are entitled to qualified immunity. Dkt. No. 77 at 15–18. They contend that the plaintiff "only disagrees with the Defendants decisions on how best to treat him" but does not cite "cases that state that his belief on how he should be cared for is what the medical professions must due [*sic*]." Dkt. No. 98 at 4. The defendants assert, "The law does not *clearly require* Defendants to have done anything differently, so they are entitled to qualified immunity." Id.

Qualified immunity "'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Figgs v. Dawson, 829 F.3d 895, 905 (7th Cir. 2016) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotation marks omitted)). Qualified immunity is an affirmative defense. To defeat the defendants' assertion of qualified immunity, the plaintiff must show that 1) the defendants violated his constitutional right and 2) the right at issue was clearly established at the time of the violation. Pearson, 555 U.S. at 232. If the plaintiff fails to satisfy either inquiry, the defendants are entitled to qualified immunity. See Muhammad v. Pearson, 900

---

[2] Because the court is granting summary judgment to defendants Jeanpierre and Weinman "'on the facts, [they] do[] not need qualified immunity.'" Sierra-Lopez v. County, Case No. 17-cv-1222, 2019 WL 3501540, at *10 (E.D. Wis. July 31, 2019) (quoting Viero v. Bufano, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996); and Antepenko v. Domrois, Case No. 17-cv-1211, 2018 WL 6065347, at *6 (E.D. Wis. Nov. 20, 2018)).

F.3d 898, 904 (7th Cir. 2018) (citing <u>Gibbs v. Lomas</u>, 755 F.3d 529, 537 (7th Cir. 2014)). For purposes of qualified immunity, the court views the evidence in the light most favorable to the plaintiff because he is the nonmoving party. <u>See</u> <u>Rainsberger v. Benner</u>, 913 F.3d 640, 647 (7th Cir. 2019).

As the plaintiff argues, cases as early as <u>Farmer</u> and <u>Estelle</u> clearly establish that refusing medical treatment for an incarcerated person suffering from a serious medical concern is unconstitutional. Dkt. No. 89 at 27. According to the plaintiff's' version of events, Nurse Ahlborg did exactly that when he told the plaintiff that he did not believe the plaintiff was experiencing tightness and pain in his chest, trouble breathing and wheezing, then walked off. As the court explained above, a reasonable jury could believe this version of events related to the plaintiff's medical treatment (or lack thereof) on June 2, 2021. A reasonable jury could find that Ahlborg disregarded the plaintiff's concern, only summarily assessed him and then left his cell. Based on <u>Farmer</u>, <u>Estelle</u> and cases since expounding on an incarcerated person's right to adequate medical treatment, the court finds that Ahlborg is not entitled to qualified immunity on the plaintiff's Eighth Amendment claim against him.

### 6. *The Plaintiff's Other Arguments*

The plaintiff raises several other issues in his declaration. Some of these relate to irrelevant topics or non-existent evidence. The court briefly will address only some of these other issues.

The plaintiff asserts that each defendant committed perjury and lied in their declarations submitted in support of their motion for summary judgment.

He asserts that Dr. Jeanpierre lied about responding to his HSU requests in May through August 2021 asking if Wixela and Advair inhalers are the same. In her response to the plaintiff's rephrased requests for admission, Jeanpierre did deny receiving or reviewing his May 24, 2021, HSU request asking about his "alvasco inhaler." Dkt. No. 95 at 99, 101. But in support of his claim that Jeanpierre lied about not reviewing that HSU request, the plaintiff cites a different HSU request that he submitted on April 12, 2021. Dkt. No. 92 at ¶5 (citing Dkt. No. 95 at 68). April does not occur between May and August 2021. That Jeanpierre responded to the plaintiff's *April* 12, 2021, HSU request does not show that she lied about not responding to his *May* 24, 2021, request or any other request that he filed between *May and August* 2021.

The plaintiff also claims that Jeanpierre lied in her response to his interrogatories about whether he was found guilty of misuse of medication. He cites Jeanpierre's response to the plaintiff's first set of interrogatories, in which he asked, "From your knowledge was [the plaintiff] ever found guilty of misuse of medication while at Waupun." Dkt. No. 95 at 125. Jeanpierre responded, "Yes." Id. The plaintiff then cites the defendants' Exhibit 1002, which shows he was charged with misuse of medication but found "Not Guilty" on September 19, 2020. Id. at ¶165 (citing Dkt. No. 70 at 1). Jeanpierre's response to the plaintiff's interrogatory shows only that, *from her knowledge*, the plaintiff had been found guilty of misuse of medication. That Jeanpierre incorrectly believed he had been found guilty of that charge is not evidence of perjury. It shows only that she mistakenly believed he had been found guilty. Jeanpierre does

not aver in her declaration that the plaintiff was found guilty of misusing his medication; she says only that he was *charged* with misuse of medication, and that HSU staff discontinued his nebulizer as a result. Dkt. No. 73 at ¶¶37, 41, 46, 51. There is no evidence that Jeanpierre committed perjury in her declaration.

The plaintiff claims that HSU manager Weinman lied in his declaration when he averred that he "did not find an HSR or Interview/Information Request form that [Weinman] personally received or reviewed where [the plaintiff] told [him] he was 'on the verge of a[n] asthma attack' and requested a nebulizer to treat his asthma." Dkt. No. 75 at ¶71. The plaintiff cites Weinman's response to the plaintiff's rephrased requests for admission, in which Weinman admits that the plaintiff submitted an HSU request on June 2, 2021 that stated "that he was 'on the verge of a[n] asthma attack'" but denies personally reviewing or receiving that HSU request. Dkt. No. 95 at 106. Much like he did with Jeanpierre's discovery responses, the plaintiff misreads Weinman's response. Weinman does not say that the plaintiff did not *file* an HSU request saying that he was "on the verge of an asthma attack"; Weinman says in both his interrogatory response and his declaration that he did not *find* an HSU request with that information that he "personally received or reviewed." Id.; Dkt. No. 75 at ¶71. These responses were consistent; they are not evidence that Weinman lied or committed perjury.

The plaintiff claims that Nurse Ahlborg committed perjury in his declaration regarding whether nursing protocol required him to "pull [the

plaintiff] out" of his cell to assess his asthma. Dkt. No. 92 at ¶¶48–50. He insists that Ahlborg contradicts himself regarding whether a nurse must assess an asthmatic patient. Id. at ¶50. Ahlborg's declaration says, "There is typically no need to pull a patient out of his cell to evaluate him for asthma-related breathing problems, as a cell-site assessment allows sufficient access to assess the patient's condition." Dkt. No. 74 at ¶15. Similarly, in his response to the plaintiff's readdressed interrogatories, Ahlborg says that a nursing assessment of an asthmatic patient "can be completed cell front," and he noted that "further assessment can be done" in an exam room if warranted. Dkt. No. 95 at 114. Ahlborg's interrogatory response and declaration are consistent. In both he says that a nurse's assessment of an asthmatic patient can be completed from outside the cell; in neither does he say that it *must* be conducted outside of the cell. He suggests in his interrogatory response that further assessment "can be done" in an exam room, but he does not say that it *must* be done that way. These responses are consistent and not evidence of perjury.

The plaintiff also says that Ahlborg must have lied in his declaration about what the plaintiff said on June 2, 2021, because Ahlborg did not write a conduct report on the plaintiff for making the vulgar comments. The fact that Ahlborg did not write a conduct report against the plaintiff for his vulgar comments does not mean that the plaintiff did not make those comments or that Ahlborg lied in his progress notes about the plaintiff's comments. Moreover, the plaintiff provided no evidence suggesting that Ahlborg, as a nurse, had the authority to write a conduct report about the plaintiff's

comments. As the court has explained, the parties' evidence shows a dispute of fact regarding what happened on June 2, 2021, including whether the plaintiff made his vulgar comments. The jury will determine whose version of events is more credible.

The plaintiff repeatedly claims that the HSU fabricated his records or omitted information from his records. But as HSU staff noted in response to his requests, the plaintiff often misread what medical staff wrote in his medical records about his visits or appointments. For example, he frequently claims that nurses falsely reported assessing him, but the medical records do not say that staff physically assessed him; they say only that a nurse reported seeing the plaintiff at his cell and speaking with him. As Jeanpierre explained, medical staff stopped physically assessing the plaintiff because he repeatedly assaulted or threatened to assault staff when they tried to assess him or pull him out of his cell to provide nebulizer treatment. And again, Ahlborg avers that staff could adequately assess the plaintiff visually from outside his cell.

The only evidence the plaintiff cites in support of his fabrication claims are declarations from other incarcerated persons. See Dkt. No. 88-1 at 84; Dkt. No. 95 at 5–8. Kurtis D. Jones generally avers that his own medical records contain errors. Dkt. No. 95 at 5 at ¶5. Terrance Kirksey discusses HSU staff and medical records, but he was not incarcerated at Waupun until August 21, 2021, after the events related to this lawsuit occurred. Dkt. No. 95 at 7–8. Damien Hewlett says *nothing* about medical staff or medical records; he merely insists that "Inmate Complaint Examiner Lana Wilson" lied when investigating

an institutional complaint. Dkt. No. 88-1 at 84. None of these statements mention the plaintiff or any defendant, and the plaintiff does not explain how they are relevant to his claims that the defendants falsified *his* records. The plaintiff also submitted several pages of his certified medical records as evidence in support of his own claims, even as he insists that his records are largely fabricated.[3] As the court has explained to the plaintiff, he cannot create a genuine dispute of fact by claiming—without evidentiary support—that his certified medical records are false. See Davis v. Gee, Case No. 14-cv-617-wmc, 2017 WL 2880869, at *5 (W.D. Wis. July 6, 2017) (citing Scott v. Harris, 550 U.S. 372 (2007); and Springer v. Durflinger, 518 F.3d 479, 484 (7th Cir. 2008)) (explaining that allegations that are "based on little more than speculation . . . [are] insufficient to manufacture a genuine issue of fact at summary judgment.").

Finally, the plaintiff asserts that the defendants failed to follow medical protocol when responding to his asthma and asthma attacks. But allegations that the defendants failed to follow policies, protocol or procedures do not state a federal claim for relief under §1983. See Estate of Simpson v. Gorbett, 863 F.3d 740, 746 (7th Cir. 2017); Scott v. Edinburg, 346 F.3d 752, 760 (7th Cir. 2003). The plaintiff is not proceeding on a claim about the defendants' failure to follow policies or procedures, and he has not explained how his assertions that they did are relevant to his Eighth Amendment claims.

---

[3] See Dkt. No. 88-1 at 1–3, 8–11, 13–14, 21, 23–42; Dkt. No. 95 at 56–64, 66–70, 72–82, 84, 89–96, 98.

### III. Conclusion

The court **GRANTS IN PART AND DENIES IN PART** the defendants'
motion for summary judgment. Dkt. No. 66.

The court **GRANTS** summary judgment for Cheryl Jeanpierre and Robert
Weinman and **DISMISSES** them from this case.

The court **DENIES** summary judgment for Robert Ahlborg on the
plaintiff's Eight Amendment claim regarding Ahlborg's assessment of the
plaintiff on June 2, 2021.

The court will enter a separate order scheduling a status conference to
determine the next steps in this case.

Dated in Milwaukee, Wisconsin this 25th day of July, 2024.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**